Perez v. Sessions, Attorney General Sessions Mr. Feigenbaum May it please the Court. My name is Jeremy Feigenbaum and I represent Petitioner Francisco Javier Perez. The IJ and BIA failed to properly consider the evidence in this case that Perez escaped from torture at the hands of MS-13, rejecting that evidence because Perez was not actually tortured. Perez credibly testified below, on page 189 of the record, that MS-13 said he would be killed if he did not join their gang. But in responding to evidence that Perez fled MS-13 repeatedly after he was threatened for refusing to join, the IJ just said, and this is on page 119 of the record in its decision, Perez has not been tortured in the past by MS-13. On each occasion that he was recruited or threatened by gang members, he was fortunately able to evade them or run away. Can I ask you, there's one of the incidents you focus on is when his friend is shot and killed. And what I was looking for was some reason to think that the shooter was an MS-13 person. Do we have any idea other than just guesswork about that? No, Your Honor, that particular incident is not one of the incidents that we say involved MS-13. So there were three incidents of what happened to him in Honduras. He was shot by a different gang, right? Correct, by the 18th Street Gang or Barrio 18. And so he has had multiple run-ins with gangs. The point that we were making there, which sort of indicates what would happen with MS-13, is the way that gangs interact with people who cross them in Honduras and the relative impunity that they have when they do so. And the facts in this case, when they relate to MS-13, particularly show that Mr. Perez had a heightened risk from MS-13 for refusing to join the gang. Again, he was threatened that he would be killed if he did not join. But what the IJ said in response essentially boiled down to, well, you were not actually harmed in the end because you were able to evade them or run away. Can I ask you kind of a weird question? I hesitate to ask. But we're proceeding exclusively under the Convention Against Torture. We're proceeding exclusively for deferral of removal for reasons that we don't need to go into. But I want to know whether it would violate the Convention Against Torture to send somebody back to a country where that person was going to be killed as opposed to tortured. Because killing and torturing strike me intuitively as somewhat different things. Yes, Your Honor. This has actually come up in this court's precedence. The case is Comillari v. Ashcroft in 2004. In that case, citing the CAT regulations, 208.18A4, Roman III, specifically say that when you're threatened with being killed, that's the worst kind of mental damage that you might suffer because it's a threat of imminent harm to yourself. And that kind of mental anguish is enough under CAT. And so if you take it out of the gang context for a second and imagine that you have a government entity threatening to kill you, it readily is understandable why that would still be considered torture under CAT. And given that the government has conceded that we're not debating the acquiescence prong here, the rule that they're defending here would apply just as much to government actors as it would to this gang. So in this case, threatened with being killed would qualify as a threat that you're going to be tortured under CAT and is something that Perez obviously had to evade. It can't be the law, as the government defended to the BIA and as it defends in its brief here, that by running away you've undermined your case. But, you know, your brief gave me the impression that he really should be able to, you know, stand in the middle of the town square and shout out, you know, I resisted MS-13 or something. I understand that you shouldn't have to live in hiding. We've made that very clear that that's not an acceptable thing. But how about just living without mentioning MS-13 one way or the other? I don't know why you would even have to say anything about it. Your Honor, that goes to the relocation prong about what he might be able to do if he moves elsewhere in Honduras and what he could talk about. One easily could have said the same thing in Velazquez-Banegas, which is the case involving whether or not you would share openly your HIV status. You might also not want to go into the middle of the town square and announce that I'm HIV positive, particularly in a country that will associate that with homosexuality and harm you in response. But the court said it's an aspect of your life. If someone is questioning you about it, you should be able to answer that question honestly, and therefore you shouldn't have to risk harm. It's the same here. Now, certainly with the HIV, though, I can imagine somebody would be saying, why are you going to the clinic every Tuesday or, you know, what? And, of course, you should be able to answer. This strikes me as a little more subtle. He doesn't have any – well, of course, he never joined, so he doesn't have the tattoos or anything like that. No, because he never joined, that's why he had to flee MS-13 ultimately. And so the relocation prong ultimately isn't enough in this particular CAT case to affirm the judgment standing alone. It's sort of like in sentencing. A CAT claim is all of the different factors put together. It's not that you must show past torture and that you must show you can't relocate. Under CAT, it's multi-factors put together into one analysis. That's what Regulation 208.16 says. But the IJ is skeptical that if he goes back now to a different part of Honduras that, let's say, the gang organization – let's get away from these individual people in the gang – but that the gang organization would devote resources to tracking him down and following up on their – well, following up on punishing him for not joining the gang. Two responses to that. One, there's no question the IJ is skeptical about the relocation prong, but ultimately Nuru v. Gonzalez explains that the past torture prong is the most important part of the analysis. And under CAT, even when there are some questions about relocation, it's rarely enough, the court held, that you can say someone likely to be tortured can simply relocate in a CAT case. So at a minimum, the BIA should make the analysis. But you are equating the earlier efforts to get him – well, what happened in Honduras, putting to one side the shooting that we've put to one side. You're saying that that's attempted torture, right? Yes, ma'am. And that's a factual question at some level. If we were to agree with you that that was attempted torture, that would be one thing. If we were to say, no, I mean, it's actually too many steps removed from committing torture in the past, where would you be? So that's the kind of factual determination we think the IJ and BIA have to make. And then the parties can return to this court and debate the merits of that fact-finding under clear error and for substantial evidence. There is no such fact-finding on this record because it's page 119 in the IJ's opinion and then record three in the BIA's opinion. They simply look at this evidence and say, yes, you said you were threatened and you were recruited, but each time you were able to get away. And so their ruling was none of this kind of evidence can come in. And our argument is simply it should be evaluated in exactly the way that you have just described and make these factual findings based on the threat that was made to him, what happened to him in the record, the reports he introduced to page 362, and the kind of evidence of what happens to other people when they resist gang. So the Rivera-Barrientos case that we cite from the Tenth Circuit lays out in detail what happens to someone who resists joining MS-13 and then nevertheless doesn't manage to run away. In response, it's a very similar case to what happened to Mr. Perez. Rivera-Barrientos was kidnapped in a car, her face was smashed with a bottle, and she was raped three times. And at the end of it, she was told, you have to join the gang now. Mr. Perez did not want to wait and see what was likely to happen to him in that situation, and so he fled. And it simply can't be the law that fleeing undermines your case. Is there no safe place in Honduras? I'm sorry, Your Honor? No safe place in Honduras? No? Correct. So the argument is that MS-13, there are 7,000 gang members in a country of 8 million, so it's a significantly smaller area that we're talking about. And MS-13 is one of the two most powerful of the 18th Street gang, of the gangs spread throughout the country. Counsel, Mr. Perez was working in southern Indiana in the poultry business near Huntingford. Yes, at Farks. As a lawful permanent resident. And the charge that creates the problem here, did that involve the woman who is now his wife? No, Your Honor, it involved a different woman. Okay. Yes, but as this court held in Wondru, although it's a detestable offense, deferral of removal specifically still exists for situations like this, because Mr. Perez should be serving his time but ultimately should not be returned to a country where he's likely to face torture at the hands of a gang like MS-13 with the government's acquiescence. And I gather the sentence here was, what, three years of a county work release facility, three years of house arrest? Yes, Your Honor. Okay. All right. All right. Thank you. Thank you. Mr. Newell. Good morning. May it please the court, my name is Craig Newell, and I'm here on behalf of the Attorney General. The court should deny this petition for review because Mr. Perez has failed to show that the record evidence compels a necessary finding for his claim that it is more likely than not that MS-13 gang members would torture him upon return to Honduras. Now, can you clarify, is it the government's position that nothing but actual torture in the past will do, or does the government leave open the possibility that attempts that the malfactor has made at torture could, in an appropriate case, putting to one side whether this is that case, but could be not? Yes, because a cat deferral or cat protection claim is this multifactored analysis, in a case where there is an attempt at torture that would factor in differently than where there was no physical contact or it all gets weighed differently. And in this case, what we have is three incidents involving his encounters with MS-13. We have his first encounter where they give him two weeks to respond to the recruitment offer. They have the second incident where they demand that he join their gang. That's when they find him in a different part of town. In a different part of town of Danly, Honduras. So he hasn't quit school yet at that point? No. Did he quit school after that? He did after that. And then those both occurred in 2003. And then he remains in Danly for five more years with no more contact or confrontations with MS-13 gang members, and he emigrates to the United States in 2008. Then in 2010, he returns there for a vacation, and he spots these same individuals from 2003, and he gets out of the area without ever making any contact with them, and it's unclear if anything would have happened. So these are the facts at hand on this case. And taking those facts at hand, the immigration judge and the board, they considered them and gave them the appropriate weight. At this point in time, Mr. Perez has to show that the record compels his desired outcome, not that a reasonable adjudicator would have viewed them differently. And you also have to take in the other factors here, and a key factor is the fact that there is no evidence of an active threat of harm against Mr. Perez personally. This court has repeatedly held that in situations where there's evidence of dangerous conditions in a country  But without any accompanying particularized threat to the petitioner, that petitioner cannot show that it's more likely than not that he would be tortured. And on review, that generalized evidence is certainly not enough to show that the record compels that finding. Mr. Rule, I confess I didn't quite understand your question to Chief Judge Wood's initial question about whether evidence of attempts to torture somebody can count towards proof that they remain at risk of torture. They would count towards their risk of torture, yes. We are on a, because this is very fact intensive, there is a sliding scale of what could happen here. We could have what happened to Mr. Perez, these few encounters. You could have, such as from the case of Orellana Arias, which involved MS-13 in El Salvador. The petitioner was repeatedly, there was extortion attempts. They kicked him once, that resulted in minor injuries. There were threats to kill that never were, no one ever tried to accomplish or go after. They were left unfulfilled, similar to this case. In Orellana Arias, the immigration judge found that there was no past torture. And in addition with the other factors, that petitioner failed to show a likelihood of future torture. And that's very similar to what we have here. And then here we don't have any physical contact or harm between the petitioner and his tormentors. So the government never follows up on these, does it? We're operating in a factual vacuum, it seems to me. We see these cases with some regularity. Somebody doesn't want to go back to a particular country and they assert one thing or another. In these cases, torture. Sometimes in the more common asylum cases, they assert persecution. And sometimes immigration judges don't think that's going to happen. And the board says it's not going to happen. And the petition for review here is denied. But we never know, actually, what happens to these people, do we? No, we do not. So we're just hoping we're right. Right. And the agents... It's a big risk to play with people's lives. It is. And that is the agency's job, and it's entrusted to the immigration judges who, in their professional capacity, hear these cases, they keep themselves abreast of the current country conditions and the countries that they see a lot of claims from. It just seems too bad that they don't ever get the feedback that might be very helpful to them as they do that job. And I think that they need to make a decision based on the evidence before them. And what we have in this case, we have country conditions evidence that shows high levels of gang violence in Honduras. No one is debating that. But if you dive into the more exacting facts, we see that MS-13 presence varies throughout the country. According to one report in the record, 60 percent of their members are in San Pedro Sula, which is in the northwest part of the country where Danly and where Mr. Perez lived was in the southern part of the country. But they obviously do have a presence in Danly, though. They do. But as the record also shows, for five years Mr. Perez remained in Honduras without any even confrontation with MS-13. While, yes, there may have been threats made at him in 2003, they made no attempts to follow through on those threats for another five years. And so it is reasonable based on those facts for the immigration judge or the board to assume that there's no current threat of harm for Mr. Perez from those individuals and even more so from the organization as a whole. It has hierarchical elements, but it is pretty localized. And so the immigration judge's finding here is supported by substantial evidence about the relocation issue. On that finding, what do we make of the immigration judge's reference to relocation in Mexico? The last page of the immigration judge's opinion. Okay. That I would call a scrivener's error. It's certainly an error, counsel. It's standing out as it does stand out. I mean, it means Honduras. Counsel, counsel. Please. Sorry. The question is, how attentive should we treat the immigration judge as having been on this issue, which seems rather critical? It would be probably a lot easier to hide in Mexico than in Honduras or to avoid gangs. Right. And it's reasonable from reading this paragraph that he meant Honduras. This is a written decision after he reviewed the entire record, the country conditions report, Mr. Perez's testimony about this issue, and found that he could safely relocate. The board then reviewed that evidence on administrative review, and Mr. Perez there nor here makes issue of that passing incorrect reference to Mexico instead of Honduras. Back to Honduras, the other person that was shot was shot by a different gang. Yes. And I assume these gang people shoot each other. Right. And it must be, I don't know how many gangs there are. Are they regionalized where certain gangs dominate one area? Yes, from the record. I don't know how much is in the record on this, but it seems to me this is a really bad place to live. Yes. And there's a lot of shooting going on, and they're a threat in this country. So I just wondered in Honduras, is that just a gang-infected country that has more than MS-13? All of them or each of them dangerous? It is. There are high levels of gang violence. There are different gangs with MS-13 and the 18th Street Gang being the main ones. Their concentrations levels vary. But in the end, what that is is dangerous conditions in Honduras. Without the particularized threat to Mr. Perez, he cannot meet the high burden of showing it's more likely than not that he would be tortured if returned to Honduras. There's no further questions. I thank you. Your Honor. All right. Thank you very much. Anything further, Mr. Feigenbaum? Yes, Your Honor. Thank you. The government essentially admits in its response that this case would be different if Mr. Perez had been physically tortured in the past and is setting up a dichotomy between torture that he was able to evade and torture that was successfully implemented by MS-13. But unfortunately, although he says there may be facts that show Mr. Perez himself wasn't going to be tortured by MS-13, he doesn't point to anything in the IJ's opinion or in the BIA's opinion to actually make that kind of fact-finding. And so what we're essentially asking for is a narrow remand to point out that you can't have a sweeping ruling that says evaded torture evidence is simply not as important because it didn't result in actual torture evidence. That's wrong as a matter of law. Now, go do the fact-finding in this particular case. Evaluate the very kinds of things that the parties have talked about in their briefs, how specific the threat had been to him at the time, what happens to other people in this country when they resist MS-13. In the record, there are reports that specifically say gang resisters get killed by MS-13. And so do that kind of fact-finding, evaluate it, and then decide on this record when you balance past torture, relocation, and all the other factors, what the right answer is. The IJ didn't do it below, and we respectfully ask the petition be granted and remanded so it can do it now. So before you sit down, I want your quick response to what seems to be one of the government's major points, which is that he goes five years between 2003 and 2008 when he moves to the United States without apparent trouble with MS-13. So MS-13 doesn't operate necessarily like some terrorist organizations, which have their top hit list and are hunting down at the time. Rivera Barrientos, the 10th Circuit case I referred to earlier with MS-13, also involved a case where they happened on a gang resistor while she was walking to the bus, and that's when they executed the torture against her. So it's not that they have to be hunting someone down to be willing to torture him when they come across that person. Okay, fine. Thank you very much. And you accepted this case by appointment from the court, as I recall, and so we thank you very much for your assistance to your client and to the court. Thank you, Your Honor. And thanks as well to the government. We will take this case under advisement.